United States District Court
Southern District of Texas
**ENTERED**
April 18, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| | § | |
| | § | |
| v. | § | CRIMINAL ACTION H-21-356 |
| | § | |
| JOHNIETHON GRIGSBY | § | |
| | § | |
| *Defendant*. | § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the court is defendant Johniethon Grigsby's ("Grigsby") motion for reconsideration.  Dkt. 24.  Following the entry of Grigsby's motion, the court held a suppression hearing in this matter on March 31, 2022.  After reviewing the motion, the hearing testimony and evidence, and the applicable law, the court is of the opinion that the motion should be GRANTED.

## I. BACKGROUND

### 1. Procedural History

Grigsby is charged by Indictment with one count of knowingly possessing a firearm as a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Dkt. 3.  On January 21, 2022, Grigsby filed his initial, one-paragraph-long motion to suppress evidence and argued that he had unreasonably been searched without a warrant.  Dkt. 19.  Grigsby did not request a hearing in his motion.  *See id.*  On January 31, 2022, the Government responded.  Dkt. 20.  In its response, the Government stated: "there was a Glock firearm with an extended magazine located in plain view, partially under the driver seat.  That firearm is depicted in Ex. 1."  *Id.* at 2.  Exhibit 1 appears to show a firearm with an extended magazine on a car floorboard.  *Id.*  The court reproduces "Ex. 1" as it appeared in the Government's brief below:



*Ex: 1 – Glock with extended magazine*

*Id.*

Because it had conducted a warrantless search pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968), the Government bore the burden of showing the reasonableness of the search. *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017).  After Grigsby failed to request a hearing in his initial motion, *see* Dkt. 19, or reply to the Government's statement of facts, exhibits, and legal arguments, the court denied his motion to suppress.  Dkt. 23.  However, as it turned out, one day after the Government filed its response, Grigsby moved for a thirty-day continuance of trial and requested a hearing on his motion to suppress.  Dkt. 21.  The court granted that continuance but failed to set Grigsby's suppression motion for a hearing.  *See* Dkt. 22.  Thus, after the court denied his motion without holding the requested hearing, Grigsby moved for reconsideration, wherein he raised the court's error and claimed that bodycam footage from the officers conducting the stop did not support the Government's contention that the firearm was in plain view.  Dkt. 24.  The court held the suppression hearing on March 31, 2022.  *See* Minute Entry of Mar. 31, 2022.

### 2.  Factual Background

Grigsby seeks to suppress evidence gleaned from a backpack found in a vehicle associated with a robbery in Houston, Texas.  Because Fourth Amendment reasonableness determinations are

fact-specific, the court discusses the record facts regarding the robbery, law enforcement surveillance associated with the robbery, the vehicle's stop and subsequent search, a later inventory of the vehicle, law enforcement's discovery that Grigsby had an open warrant, the vehicle's driver's criminal charges, and, finally, law enforcement's efforts to procure a warrant to search the vehicle.

### A.  The June 16th Robbery

On June 16, 2021, the Houston Police Department ("HPD") received reports that the EZ Pawn located at 13555 Westheimer Road (the "Westheimer EZ Pawn") had been robbed at approximately 11:56 A.M.  Dkt. 1.  Three suspects entered the pawnshop.  The first suspect wore a dark-colored hat, a dark-colored face covering, dark-colored gloves, a long white sleeve shirt, and dark pants.  *Id.*  The second suspect wore red track pants with a thin white stripe down the sides, a black shirt with a bold white stripe down the sleeves, gloves, a Pittsburgh Pirates baseball cap, and a black backpack.  *Id.*  The third suspect wore distinctive red track pants with three white stripes down the sides, a multicolored ball cap, a dark long-sleeved top with a white logo, gloves, and white low-top sneakers.  *Id.*  All three suspects held a firearm.  *Id.*  The three suspects produced their firearms and demanded entry into the jewelry display cases, safes, and gun cases, and absconded with the stolen property, including firearms.  *Id.*

### B.  The Surveillance of the 1800 Barker Cypress Apartment Complex

At approximately 2:45 P.M. that same day, HPD officers conducted surveillance near an apartment complex located at 1800 Barker Cypress Road.  According to Officer E. Sotuyo's ("Sotuyo") affidavit for a search warrant, he and his squad were investigating a series of "violent aggravated robberies, which [they] believe to be linked based upon common vehicle description, suspect description, and M.O."  Dkt. 28 at 10.  According to Sotuyo, investigations into these prior robberies led other police officers to the apartment complex located at 1800 Barker Cypress, Harris

County, Texas. *Id.* at 11. While surveilling the apartment complex on June 15, 2021—the day before the robbery in the instant matter—police "observed a black BMW X3…and a black Mercedes sedan…meet up in the parking lot." *Id.* Those officers "were aware that a black BMW X3 had been used in the pawnshop robbery on June 3, 2021." *Id.*

On June 16, 2021, following the robbery of the Westheimer EZ Pawn, police returned to the apartment complex at 1800 Baker Cypress and observed "the black Mercedes, a black Infiniti Q50…and a gray Ford F250 parked next to each other in the parking lot." *Id.* One officer then observed between five and six males and one female. According to Sotuyo's testimony during the suppression hearing, the surveilling officers were aware of the suspected robbers' clothing. Trans. 10:14:50–10:15:08. Those officers also observed the "two targets [who] look[ed] similar to the aggravated robbers…mov[e] property from one vehicle to another and…chang[e] clothes" in the parking lot. *Id.* 10:15:09–10:15:22.

### C. The Vehicle Stop

 The officers then observed the "black Infiniti Q50…exit the parking lot and make multiple lane changes with signaling." Dkt. 28 at 11–12.[1] *See also* Trans. 10:15:24–10:15:29 (stating that the officers follow the Infiniti Q50); Trans. 10:08:09–10:18:30 (discussing the basis for the traffic stop). After observing these traffic violations, officers conducted a felony stop around 5:10 p.m.

---

[1]     Section 545.104(a) of the Texas Transportation code requires an operator to signal to indicate his intention to turn, change lanes, or start from a parked position. Tex. Transp. Code Ann. § 545.104 (West). The Infiniti also had expired temporary tags. Trans. 10:18:44–10:18:55. In Texas, operating a vehicle without valid registration is a traffic offense. Tex. Transp. Code Ann. § 502.472. Officer Sotuyo testified that both traffic infractions were "arrestable offenses." Trans. 10:18:56–10:18:59. After an exhaustive search, the court has not found any statutory or caselaw stating that these everyday traffic violations are arrestable offenses. To the contrary, where the Texas Transportation Code does not provide for "another penalty," a person convicted of a traffic offense "shall be punished by a fine not less than $1 or more than $200." Tex. Transp. Code Ann. § 542.401. Section 545.104 does not provide for "another penalty," *see* § 545.104, and the $200 maximum also generally applies to operators who drive with expired registration. *See id.* § 502.471.

*Id.*  A felony stop is "where the police remain from safe cover, typically in their police cars and call out by loud voice or public announcement, to give commands to conduct the stop and remove[] the occupants from the vehicle."  Trans. 10:19:25–10:19:41; 10:22:10–10:22:12.  Sotuyo testified that the felony stop in this matter was conducted due to Grigsby's association, the suspected cell's violent crimes, and "the likelihood or high possibility…that there were firearms inside the vehicle."[2]  Trans. 10:19:50–10:20:02.

Officers stopped the Infiniti at a traffic light in the center of a busy intersection.  Dkt. 29, Def. Ex. 2 at 10:11.  Bodycam footage of the stop shows what happened next.  *See id.*  With their guns drawn, officers direct each of the vehicle's occupants—three in total—to roll down their windows and show their hands.  *Id.* 10:15–11:20.  One officer directed the driver to open the door, exit the vehicle, get on his hands and knees, and crawl toward him.  *Id.* 10:50–11:00.  Another, Officer Dimenteros ("Dimenteros"), directed the front passenger—Grigsby—to open the passenger door from the outside, exit the vehicle, and walk back while facing away from him.  *Id.* 11:20–11:54.  Dimenteros then assisted another officer in handcuffing Grigsby before directing the backseat passenger through the same detention process.  *Id.* 11:38–12:18.  Ultimately, all three of the vehicle's occupants were handcuffed and placed into separate patrol cars.  *See* Trans. 10:21:29–10:21:30.  Three of the vehicle's four doors were left open.  Dkt. 29, Ex. 2 at 12:30–12:50.

---

[2]    According to Sotuyo, Grigsby was believed to be violent, as people have "been harmed or shot or killed in connection with [him]."  Trans. 10:20:13–10:20:19.  But why officers believed Grigsby was an occupant of the Infiniti Q50 in the first instance is unclear.  Officer Sotuyo testified that one of the officers surveilling the apartment complex at 1800 Barker Cypress had both "long known" Grigsby and "was physically on site at the apartment complex when [Grigsby] entered the Infiniti."  *Id.* 10:16:30–10:16:54.  That officer apparently saw Grigsby, but the Government did not call him as a witness, *see id.*, and the officer never offered his identification of Grigsby in his report.  *Id.* 10:42:01–10:43:00.  Moreover, the officers conducting the surveillance were likely not "super close" to the suspected robbers in the apartment complex parking lot.  *Id.* 10:41:07–10:41:36.

With the three occupants detained, an unidentified officer walked around the front of the vehicle toward the driver's side. *Id.* 12:50. Another unidentified officer commented that the vehicle's keys were on the ground. *Id.* 12:51. The officer near the driver's side door appeared to crouch down slightly by the driver's console to open the trunk. *Id.* 12:52–13:030; Dkt. 29, Ex. 1 at 4:45–5:01. That officer did not pick up the keys and did not mention seeing a firearm. Dkt. 29, Ex. 1 at 4:45–5:01.

Officers then confirmed that no one was hiding in the trunk. Def. Ex. 2 at 13:03–13:06. One of the officers on the scene appeared to direct his colleagues to take the car "to repo." *Id.* 13:15. Moments later, multiple officers—three total, including Dimenteros—entered the vehicle. *Id.* 13:18. One of them appeared to have picked up the keys on the ground and placed them on the driver's seat. *See id.* 13:17–13:20. He can be seen crouching by the driver's side door with his head partially in the vehicle's cabin. *Id.* 13:20–21. But he, too, does not mention seeing a firearm. *See id.* Immediately thereafter, Dimenteros approached the driver's door, where he hovered. *Id.* 13:22–13:28. As Dimenteros bent down, the bodycam footage, though understandably imperfect, showed a white paper straw wrapper and what appears to be a black air freshener wedged between the floorboard space near the driver's seat and the vehicle's frame. *Id.* 13:30. The Government alleges that a firearm can be seen in plain view but, if so, it cannot be seen from the bodycam footage. *See* Trans. 10:28:14–10:28:18.

In any event, Dimenteros then reached into the vehicle, picked up the keys, and moved the cellphone that his colleague placed on the driver's seat. *Id.* 13:31–13:32. At that same time, separate bodycam footage showed—albeit briefly—Dimenteros ducking into the vehicle. Dkt. 29, Ex. 1 at 5:24. Indeed, at that point, Dimenteros' own body camera was facing down. Dkt. 29, Ex. 2 at 13:30–13:31. This perception is corroborated by Government Exhibit No. 2, which shows Dimenteros reaching into the car and placing his hand on, or near, an object resting on the driver's

6

seat.  Dkt. 28 at 2.  Seconds later, Dimenteros announced that "[t]hey got a pistol underneath the front seat, just so you know.  I'm not going to touch it."  Dkt. 29, Ex. 2 at 13:38–13:43.  One of the officers on the scene had a camera and appeared to be taking photos, but he did not photograph the pistol "underneath the front seat."  *Id.* 14:18.

### E.  Dimenteros Drives the Vehicle Away and Performs a Cursory Inventory

Because all of this unfolded in the middle of a busy roadway, Dimenteros moved the Infiniti to a nearby secondary location, where he helped conduct a cursory inventory of the vehicle.  Trans. 10:24:19–10:25:10.  After putting the car into gear, Dimenteros accelerated rapidly while the intersection's stoplight turned red.  Dkt. 29, Ex. 2 at 14:50–15:24.  After slowing somewhat, the engine noise featured in the footage suggests Dimenteros accelerated rapidly again.  *Id.* 15:27–15:38.  At that point, Dimenteros himself commented, "oh, it's got a little kick kick," seemingly in reference to the vehicle's quick acceleration.  *See id.* 15:39–15:40.  After stopping at a stoplight and making several turns, Dimenteros parked the car in a parking lot.  *Id.*  15:49–16:22.

Upon exiting the vehicle, Dimenteros opened the driver's side passenger door and moved a backpack located in the backseat.  *Id.* 16:27–16:41.  After moving the backpack, Dimenteros reached toward an open purse, used two fingers to wedge it open, and peered inside.  *Id.* 16:40–42. Dimenteros comments that the purse contains "stacks of money."  *Id.* 16:45:–16:47.  Commenting that he had not "touched nothing inside," Dimenteros asked his colleagues on the scene if they were going to snap pictures.  *Id.* 17:17–17:21.  Dimenteros also reported that the "gun [was] still underneath the seat."  *Id.* 17:23–17:24.

While other officers photographed the vehicle and its inner contents, Dimenteros approached the front passenger side door, opened it, and grabbed Grigsby's Louis Vuitton backpack.  *Id.* 17:51–18:00.  At that point, Dimenteros commented that the backpack was heavy and opened it.  *Id.* 18:02–18:03.  Upon opening the bag, Dimenteros reached inside and announced

"pistol." *Id.* 18:06. Two seconds later, another officer on the scene cautioned Dimenteros not to "go through everything just yet." *Id.* 18:08–18:09. Having already partially searched the backpack, Dimenteros said, "you said not to dig, so I didn't dig." *Id.* 18:13–18:14. The officer photographing the car does not appear to open any of the other two bags, opting instead to photograph them from a comfortable distance. *See id.* 18:17. Bodycam footage also showed another officer crouching down by the driver's seat; that officer does not appear to be photographing the vehicle's contents. *Id.* 18:19–18:52. *See generally* Dkt. 28 at 3, 6, 7.[3]

Approximately two minutes later, Dimenteros returned to the Louis Vuitton backpack and resumed searching through it. *Id.* 20:26–20:47. Dimenteros then directed the photographer to "take pictures of the money," which he noted was "in the front of the bag." *Id.* Those photographs are featured below. During that same cursory inventory, another officer photographed the firearm under the driver's seat. Dkt. 28 at 4. That photograph, which is listed as Government Exhibit No. 4, shows the barrel of a handgun and the bottom portion of a magazine. *Id.* Meanwhile, another officer is heard stating that the "marked units" were to take "everybody" and "drop[] them off at the ATF building." *Id.* 21:17–21:21. Dimenteros then crossed the front of the vehicle and, once more, approached the driver's seat. *Id.* 21:23–21:31. From Dimenteros' position—and with the assistance of the sunlight—the viewer can clearly see the white straw wrapper and the black air freshener on the floorboard. *Id.* 21:31. No firearm is in plain view. *See id.*

Dimenteros then reached underneath the driver's seat with his left hand. *Id.* 21:33. With his hand partially under the seat, Dimenteros pulled the firearm from underneath the seat and

---

[3]     The court notes that this photograph evidencing that the firearm was in plain view differs—dramatically—from the Government's Exhibit 1, which appears to show a firearm with an extended magazine on a car floorboard and that the prosecution reproduced for the court's consideration in its initial briefing. *Compare* Dkt. 28 at 4, *with* Dkt. 20 at 2.

handled it from its extended magazine. *Id.* 21:33–21:35. Dimenteros then placed the firearm on the driver's seat and walked away. *Id.* 21:36–21:38.

The photographs officers took are featured below.[4]



Next, Dimenteros returned to the open trunk. Dkt. 29, Ex. 2 at 22:20. As Dimenteros sifted through the trunk's contents, another officer—the one who appears to have done the bulk of the photographing—can be heard telling him, "Don't touch nothing." *Id.* 22:20. That officer then

---

[4]  *See* Dkt. 28 at 3, 4, 6, 7. In its initial response, the Government included a photograph of Government's Exhibit 3, which shows the open Louis Vuitton backpack on the passenger floorboard. *See* Dkt. 20 at 4. The Government represented to the court that, after the "vehicle was moved to a safe location," it "was…photographed, including the Louis Vuitton bag which was with [Grigsby] when officers approached and which remained on the passenger side floorboard as depicted." *Id.* But Dimenteros body camera footage, which shows him opening the large zipped inner compartment, handling the backpack, lifting it, opening other zipped pockets, and putting his hand into the bag, dispels this assertion. *See* Dkt. 29, Ex. 2 at 17:51–20:47.

directed Dimenteros to "close the doors." *Id.* 22:22. Heeding his colleague's orders, Dimenteros

returned to the driver's seat, picked up the gun he had left on the seat, placed it underneath the

seat, and commented to himself, "put it back." *Id.* 22:37–22:38. After Dimenteros returned the

firearm, the butt of the extended magazine can be seen protruding from underneath the seat.[5] *Id.*

22:38.

During the suppression hearing and regarding the initial inventory, Sotuyo testified as

follows:

> Q: You mentioned an inventory search. Is it HPD policy to conduct an inventory before or after taking the car to the Dart lot?
> A: Before.
> Q: And you said cursory. So is a full inventory done at this secondary location?
> A: No, it's not.
> Q: But is an officer present who can take photographs and document the location of items?
> A. Yes
> Q: Is that consistent with HPD policy?
> A: Yes.

[…]

> Q: And [in] the bottom right-hand corner of that picture we have an up-close of the bag. Is that correct?
> A: Yes.
> Q: Now was the bag open or closed when officers first approached?
> A: It was closed.
> Q: Why did they open it?
> A: To do — to see if there was any contraband inside.

[…]

> Q. So, is this bag something that was going to be taken to the Dart lot and inventories?
> A: Yes.

---

[5] It is unclear when the initial photograph of the firearm was taken and if photographing resumed after the one officer directed his colleagues to close the door. For the purposes of this motion, the court will assume that the Government's Exhibit 4 was taken before Dimenteros moved the firearm because, ultimately, it does not alter the court's legal conclusions.

Trans. 10:25:48–10:27:16.  The Government did not produce HPD's inventory policy, but Sotuyo testified that it was "standard" for officers to document in pictures items in an inventory prior to towing to the Dart lot.  *Id.* 10:28:57–10:29:09.

### F.  The Police Learn About Grigsby's Open Warrant

After officers photographed and searched the Infiniti Q50, a different officer asked Grigsby for his name.  After running Grigsby's name through the computer, the officer discovered that Grigsby had a warrant out for his arrest.  Dkt. 29, Ex. 1 at 11:53; Trans. 11:22:30–11:22:45.

During the suppression hearing, the Government argued that (1) one of the officers surveilling the apartment complex knew Grigsby by name and sight; (2) apparently saw Grigsby; and (3) knew Grigsby had an open parole warrant.  *See, e.g.*, Trans. 10:46:16–11:40:30.  But Sotuyo's own testimony does not fully support the Government's framing.  To be sure, Sotuyo represented that one of the on-site officers "saw the males in the parking low and…identified one of the males visually to be…Grigsby."  *Id.* 10:42:01–10:42:25.  But—based on Sotuyo's testimony—the officer making this identification did not communicate it until after the Government began preparing for the suppression hearing.  For instance, Sotuyo acknowledged that the on-site officer who purportedly identified Grigsby made no mention of his identification in the reports he authored shortly after the events of June 16th, despite that detail being important.  Trans. 10:33:38, 10:42:28–10:43:00, 10:43:30.  The Government did not submit those reports into evidence or call the officer to testify. Sotuyo also testified:

> Q.      …The information that…you represented to the Court today that [the officer] knew who Grigsby was, you got that from talking to [him] in the last few days on the telephone, correct?
> A.      Yeah.  We spoke with him also a few weeks ago.
> Q.      You called him and told him, hey, there has been a motion to suppress filed in this case.  And there is a hearing, and you called him to talk about the case at that point. At that time is when he told you I knew who [] Grigsby was, right?
> A.      That's correct.

Trans. 10:33:38–10:34:32.

However, several minutes later, Sotuyo, contradicting his previous testimony, reported that he spoke with the on-site officer last year, at which time "he told me…that he had identified one of the males in the parking lot to be [] Grigsby." *Id.* 10:43:00–10:43:22.

Regarding Grigsby's eventual arrest, Sotuyo testified:

Q.    After that vehicle was stopped was there any way [Grigsby] wasn't going to be arrested?
A.    No.
Q.    Is it typical to identify witnesses in a vehicle or to ask for people's names?  In the middle of an arrest?
A.    In the middle of an arrest?
A.    No.

Trans. 10:31:16–10:31:27.

### G.  The Driver is Charged with Unlawfully Carrying a Weapon

Three days after the events of June 16th, on June 19, 2021, the Harris County District Attorney's Office charged the Infiniti's driver with unlawfully carrying a weapon.  Dkt. 29 at 2. According to the charging documents, the driver incurred this charge because "the handgun was in plain view" in his vehicle.  *Id.*  But during the suppression hearing, Sotuyo testified:

Q.    In addition to the traffic infractions, is [the driver] charged with anything in the state of Texas?
A.    Yes.  He was charged *on that day* for unlawfully carrying a firearm.  A weapon.
Q.    And once that happens are officers able to conduct a search incident to arrest?
A.    Yes.
Q.    And in addition to the search incident to arrest, after seeing a firearm and developing additional probable cause, are officers able to search based on probable cause?
A.    Yes.

Trans. 10:15:18–10:25:47 (emphasis added).

### G.  Officer Sotuyo Applies for a Warrant to Search the Vehicle

Eventually, Sotuyo drafted a search warrant affidavit, which he filed on June 23, 2021, one week after the events of June 16th.  *See* Dkt. 28 at 12.  In it, Sotuyo described how officers (1) observed the Infiniti Q50 parked next to the BMW X3 and Mercedes associated with the

Westheimer EZ Pawn; (2) witnessed the Mercedes leave the apartment complex parking lot; (3) stopped and searched the Mercedes; and (4) "[s]imultaneously" observe the Infiniti "also exit the parking lot and make multiple lane changes without signaling."[6]  *Id.* at 11–12.  Sotuyo also reported that an Officer West, a peace officer employed with HPD's Violent Offender Squad, "informed me that he completed the inventory for tow of the black Infiniti Q50 and observed a Glock 26 pistol…with an extended magazine in plain view *behind* the driver's seat." *Id.* (emphasis added).  Sotuyo noted that the pistol resembled one used during the armed robbery of the Westheimer EZ Pawn.  *Id.*  The state court issued a warrant, which officers then executed on the vehicle and the backpack.  *See* Trans. 10:29:31–10:29:59.  From the backpack, officers recovered four pistols stolen from the Westheimer EZ Pawn.  *Id.* at 10:30:05–10:30:17.

## II.  LEGAL STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "As the text makes clear, the ultimate touchstone of the Fourth Amendment is reasonableness." *Riley v. California*, 573 U.S. 373, 381, 134 S. Ct. 2473 (2014) (internal quotations omitted).  Measured "in objective terms by examining the totality of the circumstances," reasonableness "eschew[s] bright-line rules, instead emphasizing the fact-specific nature of the…inquiry."  *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S. Ct. 417, 421 (1996).  A reasonableness inquiry, the Fifth Circuit has explained, "requires a balancing of the public interest with an individual's right to be

---

[6]    According to the sworn criminal complaint in this matter, officers observed the Infiniti Q50 leave the apartment complex parking lot approximately fifteen minutes after witnessing the Mercedes leave.  Dkt. 1 at 7 ¶ 13.  Based on Sotuyo's affidavit, it is unclear if he states that officers saw both vehicles leave "simultaneously" or if the Infiniti's departure was simultaneous to law enforcement's stop of the Mercedes.  *See* Dkt. 28 at 11.

free from arbitrary intrusions by law enforcement." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc).

In general, "on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights." *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993). This burden, however, shifts to the Government if the search or seizure in question was performed without a warrant. *See United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). The Government must satisfy that burden by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14, 94 S. Ct. 988 (1974).

## III. DISCUSSION

In its initial response to Grigsby's motion to suppress, the Government argued that (1) the traffic stop was based on a violation of the Texas Transportation Code; (2) the stop was justified as a legal felony stop; (3) the search of the vehicle and the backpack was part of a lawful *Terry* wingspan search, probable cause based on Grigsby's status as a felon in a vehicle with a firearm in plain view, search incident to Grigsby's arrest, a lawful inventory search, and, finally, a search warrant. Dkt. 20 at 1. In his motion for reconsideration, Grigsby argues that the handgun was not in plain view and that officers, therefore, were not legally entitled to search the vehicle incident to arrest. Dkt. 24 at 4. Moreover, Grigsby argues that the search of the vehicle was not justified incident to his arrest because officers conducted the search prior to becoming aware that Grigsby had an open warrant. *Id.* Finally, because he was handcuffed and placed in the back of a police car prior to the vehicle's search, Grigsby argues that *Terry* does not authorize the search.

Though the court agrees with the Government that *Terry* authorized Dimenteros' initial protective search of the vehicle, it concludes that the Government did not meet its burden in proving by the preponderance that an exception to the Fourth Amendment's general prohibition

14

on warrantless searches authorized Dimenteros' subsequent search of Grigsby's bag.  Finally, the court concludes that the Government failed to show by the preponderance that the inevitable discovery doctrine applies to the facts on this record.

### 1.  The Stop and Subsequent Search of the Vehicle were Authorized Under *Terry*.

Under *Terry*, warrantless searches following a traffic stop are permissible, provided the Government satisfies a two-step inquiry.  392 U.S. at 1; *United States v. Bams*, 858 F.3d 937, 942 (5th Cir. 2017).  "For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle."  *United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013).  If the traffic stop is justified at its inception, courts must determine "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place."  *Bams*, 858 F.3d at 942.

### A.  Officers Reasonably Suspected that the Infiniti Q50's Occupants were Involved in the Armed Robbery.

The court is persuaded that *Terry*'s first requirement—that the police possess "objectively reasonable suspicion that some sort of illegal activity" occurred—is satisfied.  *See Andres*, 703 F.3d at 832.  First, though he lacked personal knowledge of the traffic stop, Sotuyo had previously read the report wherein other officers detailed the improper lane changes giving rise to the traffic stop.  Trans. 10:15:24–10:15:29; 10:08:09–10:18:30.  Second, apart from their reasonable belief that the vehicle's driver committed a traffic violation, the police had reasonable suspicion that the vehicle's occupants were involved in the armed robbery.  *See* Dkt. 28 at 10–11.  Mere hours after the Westheimer EZ Pawn's robbery, where firearms were among the stolen loot, officers observed a BMW X3 matching the description of the robbers' vehicle at the 1800 Barker Cypress apartment complex.  *Id.*  Of course, officers also suspected that the BMW X3 was used as the getaway car in

15

other recent armed robberies.  Trans. 10:13:20–10:13:23.  And the driver of the X3 parked next to

the Infiniti Q50 at the 1800 Barker Cypress complex.  *Id.* 10:13:53–10:14:07.

Separate from their suspicions surrounding the X3's use in armed robberies, officers

observed "two targets" among the six or seven individuals in the parking lot "[who] look[ed]

similar to the aggravated robbers…mov[e] property from one vehicle to another and…chang[e]

clothes" in the parking lot.  *Id.* 10:15:09–10:15:22.   Taken together, these facts "presented

objective indications" that the vehicle's occupants were also involved in the armed robbery,

thereby justifying the felony stop.  *See United States v. Ibarra-Sanchez*, 199 F.3d 753, 758–59 (5th

Cir. 1999) (felony stop supported by reasonable suspicion that vehicle's occupants loaded a

substantial amount of drugs into van).  In that respect, reasonable suspicion supported the felony

stop even in the absence of a traffic violation.[7]

---

[7]     The court is not persuaded that officers had reasonable suspicion to believe that Grigsby, himself, was among the Infiniti's passengers.  To be sure, the Government established that officers on site knew Grigsby "by name and sight."   Trans. 10:12:54–12:12:58; 10:16:39–10:16:50.  However, the court does not credit Sotuyo's second-hand testimony that an officer surveilling the apartment complex observed Grigsby, either at the apartment complex or in any of the vehicles on site.  *See id.* 10:16:30–10:16:54.  According to Sotuyo's testimony, Grigsby's violent character contributed to the reasonable suspicion necessary to make the stop.  But the body camera footage suggests that the officers who conducted the felony stop did not appear to know of Grigsby, let alone his violent character.  *See generally* Dkt. 29, Exs. 1, 2.  Moreover, Sotuyo's testimony about when *he* learned of Grigsby's identification at the apartment complex was internally contradictory.  On the one hand, Sotuyo testified that he learned of Grigsby's identification at the apartment complex in the days and weeks preceding the suppression hearing.  *See* Trans. 10:33:38–10:34:32.  On the other, Sotuyo also testified that the officer who made the identification told him "that he had identified one of the males in the parking lot to be [] Grigsby" last year.  *Id.* 10:43:00–10:43:22.  The officer who allegedly identified Grigsby did not include that detail in his reports, even though, as Sotuyo acknowledged, it was important.  *Id.* 10:33:38, 10:42:28–10:43:00, 10:43:30.  The Government, for its part, did not call the officer who was on site when Grigsby allegedly entered the Infiniti.  *See id.* 10:16:58–10:17:00.
       More generally, the basis for the Government's suspicions vis-à-vis Grigsby appears to be that he was a suspect in a robbery that occurred over a month earlier and that either his girlfriend (or ex-girlfriend), or a vehicle associated with him that was registered to her, had previously been seen at the apartment complex.  *Id.*  10:06:07–10:07:26; 10:13:53–10:14:07.  Relatedly, when officers went to the Barker Cypress apartment complex, they were not looking specifically for Grigsby.  *Id.* 10:12:49–10:12:52.  Officer Sotuyo confirmed that there was no association between

16

**B.  Dimenteros' Initial Protective Search of the Vehicle was Reasonable.**

The parties devote considerable attention to whether the firearm "underneath" the driver's seat was in plain view and, if so, its legal relevance.  Looking to *Terry*, the Government initially argued that the firearm located partially under the driver's seat was in plain view and that its plain view status authorized an expanded search.  Dkt. 20 at 3.  But the court does not find that the Government has proved, by the preponderance of the evidence, that the firearm was in plain view at the time of the initial stop for three reasons.[8]  Nor does it conclude that the firearm's plain view status bears on the reasonableness of Dimenteros' subsequent search of Grigsby's backpack during the cursory inventory.  For completeness, the court discusses the facts and their legal relevance under *Terry*.

Turning first to the court's factual findings, two officers entered the space around the driver's seat—the first to pop the trunk and the second to pick up the keys and cellphone on the ground—and neither commented on seeing the gun.  *See* Dkt. 29, Ex. 1 at 4:35–5:01, Ex. 2 at 12:52–13:03, 13:17–13:21.  The court considers their silence as evidence that they did not see the firearm, which cuts against the Government's contention that it was in plain view.  *See* Trans. 10:28:14–10:28:18.  Second, Dimenteros' body camera footage indicated that he leaned and reached into the vehicle to move the cellphone and keys that his colleague placed on the seat, improving his vantage.  Dkt. 29, Ex. 2 at 13:30–13:32, Ex. 1 at 5:24.  *See also* Dkt. 28 at 2.  The

---

the BMW X3 and Grigsby.  *Id.* 10:40:20–10:40:232.  And there was no testimony that Grigsby, himself, lived at or frequented the apartment complex.

[8]      The court appreciates that photographs taken during the cursory inventory search show the firearm with clearer focus.  *See* Dkt. 28 at 4.  However, considering Dimenteros' rapid acceleration, stopping, and turning, the court cannot conclude that the firearm stayed in one place.  Indeed, for anyone who has dropped a cellphone or heavy book on a vehicle's floorboard can attest, items shift during transport—and it seems likely, here, that the firearm did not stay stationary during episodes of rapid acceleration, stopping, and turning.  *See* Dkt. 29, Ex. 2 at 14:50–16:22.  Thus, under the preponderance standard, the court is not persuaded that the cursory inventory photographs accurately depict the firearm's position when Dimenteros first spotted it.

footage did not show the firearm in plain view, even as it picked up other dark objects, like the black air freshener, and showed the tip of the firearm's extended magazine *after* Dimenteros handled it during the cursory inventory search. *See id.* 13:30, 22:38. Third, and finally, when Dimenteros first saw the firearm, he announced that it was "underneath" the front seat—an observation he repeated when he invited his colleagues to photograph the weapon during the cursory inventory search. *Id.* 13:38–13:43, 17:23–17:24. A firearm that is "underneath" a seat visible from a search is not in plain view.

And in this circuit, an officer's positioning himself through a vehicle's window or doorway to improve his view can constitute a search. *See, e.g.*, *United States v. Ryles*, 988 F.2d 13, 15 (5th Cir. 1993) (finding that officer conducted a warrantless search when "pierced the airspace inside" a vehicle before smelling burnt marijuana); *United States v. Pierre*, 958 F.2d 1304, 1310 (5th Cir. 1992) (en banc) ("[I]n evaluating the reasonableness of the *search*…an agent at a checkpoint…would have good reason to position himself [through a car door window] so he could see the person with whom he is speaking."). Looking to this caselaw—and in the absence of proof, under the preponderance standard, that the firearm was in plain view—the court assumes for the sake of argument that Officer Dimenteros' initial identification of the firearm was the fruit of a search.

Grigsby insists that if the firearm was not in plain view, Dimenteros was never authorized to seize and search the vehicle. *See* Dkt. 24 at 3–4. The court disagrees. The Supreme Court has recognized that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047, 103 S. Ct. 3469 (1983). In *Long*, Michigan police officers stopped to investigate after a car swerved off the road and into a shallow ditch. *Id.* at 1035. When they approached, Long, the vehicle's only occupant, met them at the rear of the car and had left the driver's side door open. *Id.* at 1036. After an unproductive

18

conversation with Long, who appeared intoxicated, the officers performed a *Terry* protective pat-down. *Id.* When following Long back to his vehicle, the officers observed a hunting knife on the driver's side floorboard. *Id.* One of the officers performed a cursory search for weapons—including lifting the center armrest—and uncovered marijuana. *Id.*

Reversing the Michigan Supreme Court, the *Long* Court held that searches of "those areas in which a weapon may be placed or hidden…is permissible if the police officer possesses a reasonable belief based on specific articulable facts which…reasonably warrant the officers believing the suspect is dangerous and…may gain immediate control of weapons." *Id.* at 1049. That the officers searched Long's vehicle while subjecting him to a *Terry* investigative detention did not alter this conclusion because, unless Long was placed under arrest, he would be permitted reentry to his car, where he could then access any weapon to the potential detriment of the officers. *Id.* at 1051–52.

Under *Long*, the Fifth Circuit has upheld protective searches "where the police officer had an objective reason to fear for his safety or the safety of others." *United States v. Wallen*, 388 F.3d 161, 165 (5th Cir. 2004). As the *Wallen* court commented, the Fifth Circuit has rejected protective searches only where "officers had almost nothing on which to base a concern for safety." *Id.* For example, in *United States v. Hunt*, the Fifth Circuit reversed the district court's denial of the defendant's motion to suppress where the police officer performed a protective search after the driver greeted the officer outside of his vehicle. 253 F.3d 227, 232 (5th Cir. 2001). There, the court of appeals explained that "the act of a driver who has been stopped for a traffic violation leaving his car to greet the officer" did not create "a permissible or compellable inference that the automobile contains contraband or weapons." *Id.* at 232.

The officers in this case had reasonable suspicion that the vehicle's occupants were potentially involved in an armed robbery where a store clerk was held at gunpoint and firearms

stolen. *See* Dkt. 28 at 10. In the minutes following the felony stop where none of the three occupants had been formally arrested or taken off-site, Dimenteros had objective reason to believe that they "w[ould] be permitted to reenter [the] automobile, and…then have access to any weapons inside." *See Long*, 463 at 1051–52. *See also* Dkt. 29, Ex. 2 at 10:15-12:18; Trans. 10:21:29–10:21:30. Accordingly, *Terry* and *Long* justified Dimenteros' initial search, wherein he spotted the firearm underneath the driver's seat.

Relying on the Supreme Court's decision in *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710 (2009), Grigsby argues (1) that the vehicle's occupants were functionally arrested because they were placed in handcuffs and escorted to the backs of patrol cars and (2) that *Gant* prohibited a search of the vehicle incident to the occupants' de facto arrest. *See* Dkt. 24 at 4–5. In *Gant*, officers formally arrested Gant for driving with a suspended license, handcuffed him, and placed him in the back of a patrol car. 556 U.S. at 335. The Supreme Court determined that the subsequent search of his vehicle was unreasonable because "police could not reasonably have believed either that Gant could have accessed his car at the time of the search or that evidence of the offense for which he was arrested might have been found therein." *Id.* at 344. As the *Long* Court likewise recognized, concerns surrounding an individual's subsequent access to dangerous contraband within a vehicle have less force when an arrest all but ensures that he will not be afforded immediate reentry to the car. *See* 463 U.S. at 1049.

But Grigsby's comparison to *Gant* fails on the first point. Being handcuffed and escorted to patrol cars do not, by themselves, convert temporary detention authorized under *Terry* into a de facto arrest, especially where "[t]he possibility that [the police] might release [the occupants] to [their vehicle]" remains. *See Wallen*, 388 F.3d at 166. In the moments following the felony stop, with the occupants' *Terry* detention still in its infancy, law enforcement had the authority to perform a protective search. Dimenteros did that when he bent down, stuck his head into the car,

and spotted the firearm underneath the seat.  Therefore, the court concludes on the narrow issue of Dimenteros' initial search, wherein he saw the firearm "underneath" the seat, was reasonable under the Fourth Amendment, *Terry*, and *Long*.

### 2.   The Subsequent Moving of the Vehicle

Though neither party argues the issue, the court notes that officers may seize a vehicle from a busy roadway without running afoul of the Fourth Amendment through the "community caretaking" exception.  *See United States v. Castro*, 166 F.3d 728, 734 (5th Cir. 1999) (en banc). Originating from the Supreme Court's decision in *South Dakota v. Opperman*, the "community caretaking" exception to the Fourth Amendment permits the removal of automobiles that "jeopardize both…public safety and the efficient movement of vehicular traffic."  428 U.S. 364, 368, 96 S. Ct. 3092 (1976).  Though lacking standardized criteria to determine the exception's applicability, the Fifth Circuit has emphasized that its analysis "hinges upon the reasonableness" of the seizure "viewed in the context of the facts and circumstances encountered by the officer." *United States v. McKinnon*, 681 F.3d 203, 208 (5th Cir. 2012).  Here, the decision to move the vehicle to the parking lot was reasonable considering its placement at a busy intersection, which presented obvious risks to traffic safety and efficient movement.  *See Opperman*, 428 U.S. at 368; Dkt. 29, Ex. 2 at 10:11.

### 3.   The "Cursory" Inventory Search

To briefly summarize, the court has concluded that (1) the firearm was not in plain view but (2) Dimenteros' initial, protective search and movement of the car were nevertheless reasonable.  *Supra* 17–21.  Grigsby, however, does not seek to suppress evidence of the firearm underneath the driver's seat but the guns found in his backpack during, initially, the "cursory" inventory search.  *See* Trans. 10:25:10 (describing the inventory search as "cursory").  As previously noted, warrantless searches are presumptively unreasonable under the Fourth

21

Amendment. *Horton v. California*, 496 U.S. 128, 133, 110 S. Ct. 2301 (1990). "There is, however, an exception to the warrant requirement when a law enforcement officer conducts an inventory of seized property if that inventory is part of a bona fide police routine administrative caretaking function." *United States v. Lage*, 183 F.3d 374, 380 (5th Cir. 1999) (internal quotations omitted).

Still, inventory searches may "not be a ruse for general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4, 110 S. Ct. 1632 (1990). To guard against such unscrupulous searches, the "Supreme Court has dictated that a single familiar standard is essential to guide police officers." *Lage*, 183 F.3d at 380 (internal quotations omitted). Accordingly, "an inventory search of a seized vehicle is reasonable and not violative of the Fourth Amendment if it is conducted pursuant to standardized regulations and procedures that are consistent with (1) protecting the property of the vehicle's owner, (2) protecting the police against claims or disputes over lost or stolen property, and (3) protecting the police from danger." *McKinnon*, 681 F.3d at 209 (quoting *Lage*, 183 F.3d at 380). These regulations must "sufficiently limit the discretion of law enforcement officers to prevent inventory searches from becoming evidentiary searches." *United States v. Andrews*, 22 F.3d 1328, 1336 (5th Cir. 1994). Importantly, "it is beyond serious debate that the prosecution bears the burden of establishing that any evidence submitted, which resulted from an inventory search, was the result of a search conducted in accordance with known, established police procedures." *United States v. Hope*, 102 F.3d 114, 115 (5th Cir. 1996).

Though "general rummaging" in search of evidence is prohibited, *see Wells*, 495 U.S. at 4, Dimenteros did just that during the cursory inventory search. *See* Dkt. 29, Ex. 2 at 17:51–20:47. Dimenteros lifted Grigsby's backpack from the passenger floorboard, placed it on the seat, opened it, stuck his hand in the bag, and identified the firearms therein. *Id.* Two seconds after his initial search of the backpack, one of Dimenteros' colleagues, who appeared to have been participating

22

in the inventory, told Dimenteros not to "go through everything just yet." *Id.* 18:08–18:09.  Still, officers photographed the bag's inner contents at Dimenteros' direction.  After searching the backpack's large pocket, Dimenteros said, "you said not to dig, so I didn't dig." *Id.* 18:13–18:14. Bodycam footage showed that absent Dimenteros' direction, the photographers on scene photographed items within the car at a comfortable distance. *See id.* 18:17.  Despite his colleague's cautionary warning, Dimenteros returned to the backpack a couple of minutes later and opened the front, small pocket, discovering the cash. *Id.* 20:26–20:47.  When Dimenteros began to sift through items in the vehicle's trunk, one of his colleagues told him, "don't touch nothing" and ordered him to "close the doors." *See id.* 22:20–22:22.  Dimenteros then returned to the driver's door, picked up the firearm he had previously removed from the seat, and returned it to his estimation of its original position. *See id.* 22:37–22:38.

The Government did not submit HPD's inventory policy—cursory or otherwise—into evidence or read it into the record during the suppression hearing.  Sotuyo testified that it was HPD policy to conduct a cursory inventory search prior to impounding the vehicle.  Trans. 10:25:52–10:26:06.  Though the court did not find Sotuyo extremely credible, the court credits that aspect of his testimony, especially in light of the officers' conduct during the inventory search, which, but for Dimenteros' conduct, appeared routine and systematized. *See* Dkt. 29, Ex. 2 at 17:51–22:22.

Common sense militates in favor of finding that photographing a firearm, at that point partially underneath the seat, falls within the scope of a cursory search.  But with respect to the search of Grigsby's backpack, it is impossible for the court to determine whether this inventory search complied with the HPD's inventory policy because it is not readily apparent that a cursory inventory search would authorize officers to search the inner contents of a container.  And while the Supreme Court has stated that "standardized criteria…must regulate the opening of containers

23

found during inventory" to prevent the inventory search from devolving into a "ruse for general rummaging," Sotuyo did not discuss the standards governing the "cursory" inventory check and the Government did not produce the policy into evidence. *See Wells*, 495 U.S. at 4. Instead, Sotuyo's testimony only established that Officer Dimenteros opened the bag "to see if there was any contraband inside," not that checking for contraband inside personal containers was permissible under HPD's "cursory" inventory policy.[9]  Trans. at 10:26:55–10:27:17.

The behavior of Dimenteros' colleagues, and their reactions to him, also suggest that Dimenteros was not abiding by the policy when he was searching Grigsby's backpack. If HPD's cursory inventory policy permitted Dimenteros to "go through everything" and "touch" items within the vehicle, his colleagues likely would have done the same instead of photographing from a greater distance. *See* Dkt. 29, Ex. 2 at 18:17. Moreover, if Dimenteros' conduct was consistent with HPD policy, his colleagues likely would not have twice ordered him to stop his search. *See id.* 18:08–18:09, 22:20–22:22. In view of the totality of facts surrounding the inventory search and the Government's burden by the preponderance, the court cannot conclude that Dimenteros' search of Grigsby's bag was reasonable under the inventory exception to the Fourth Amendment.

Nor was the search of the bag reasonable under a *Terry* protective sweep, as the Government initially argued. *See* Dkt. 20 at 5. Assuming arguendo that *Terry*, *Long*, and their progeny authorize protective searches of bags, Dimenteros did not search the bag until after arriving at the temporary parking lot, and officers on the scene already determined that the vehicle would be impounded. *See* Dkt. 29, Ex. 2 at 13:15 (officer seeming to direct colleagues to take car "to repo"), 21:17–21:21 (officer commenting that "marked units" would be taking "everybody"

---

[9]     For that same reason, Officer Sotuyo's testimony that the "bag" would eventually be inventoried at the Dart lot, *see id.* at 10:27:13–10:27:17, fails to establish that a search of the bag, itself, would fall within the scope of an even more extensive inventory policy.

and "dropping them off at the ATF building"); Trans. 10:25:13–10:25:17 (testifying that driver was "arrested or arrestable"), 10:25:46–10:26:00 (testifying that cursory inventory is performed before vehicles are taken to impound lot).

That Grigsby had not been formally arrested or Mirandized at this point does not alter this conclusion because his detention "morphed from a *Terry* detention into a de facto arrest." *See United States v. Zavala*, 541 F.3d 562, 579–580 (5th Cir. 2008). "An arrest occurs when, in view of the all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Lincoln v. Turner*, 874 F.3d 833, 841 (5th Cir. 2017). Though only detained, at that point, for approximately twenty minutes, Grigsby "was handcuffed, placed in a police car, transported to different locations, and was not free to leave."[10] *See id.* at 579. The evidence—from the body camera footage and Sotuyo's testimony—overwhelmingly demonstrates that law enforcement did not intend to permit Grigsby or the vehicle's other occupants to leave, and that they were conducting an inventory search of the vehicle unrelated to safety concerns. *See, e.g.*, 10:25:48–10:27:16 (testifying that officers were performing an inventory search because the vehicle was going to be impounded); Trans. 10:31:16–10:31:27 (testifying that once "vehicle was stopped," there was "no" way Grigsby would not be arrested); *supra* at 23–25. Therefore, any protective sweep performed at that point was unnecessary to ensure officer safety and was not

---

[10]    In fact, the body camera footage shows that Grigsby's detention exceeded approximately one hour and thirty minutes before law enforcement brought him to the ATF building, where the sworn complaint says he was finally Mirandized. *See* Dkt. 29, Ex. 2; Dkt. 1 at 7–8 ¶ 15. *Cf Zavala*, 541 F.3d at 580 ("[W]e have never held that the police officer can detain a defendant for one hour and thirty minutes until a full-blown drug investigation is completed.") Of course, once officers learned of Grigsby's parole violation, they had probable cause for their de facto arrest. *See Lincoln*, 874 F.3d at 841 (noting probable cause is required for a de facto arrest). The court notes, however, that were it to credit the Government's argument that officers knew of Grigsby's open parole warrant before conducting the felony stop—and, likewise, knew that Grigsby could be arrested on that basis—then there was no reason to initially detain him without also providing *Miranda* warnings. *See United States v. Abulyan*, 380 F. App'x 409, 411 (5th Cir. 2010) (noting that *Miranda* warnings "would be required" for de facto arrest).

authorized under *Terry*. *See United States v. Thomas*, 997 F.3d 603, 615 (5th Cir. 2021) (noting that *Terry* search analysis is "directed by the principle that officers are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop'") (quoting *United States v. Hensley*, 469 U.S. 221, 235, 105 S. Ct. 675 (1985)).

Finally, the court turns to the last argument the Government raised in its initial briefing: that the search of Grigsby's bag was done incident to his arrest. *See* Dkt. 20 at 5 (arguing that the search of the bag was a proper "search incident to arrest"). That theory does not hold up against the facts and, in any event, is foreclosed by *Gant*. First, the facts demonstrate that, at the time of Dimenteros' initial search of the bag, Grigsby was not under arrest and the patrol officer had not yet learned of his open warrant. *Compare* Dkt. 28, Ex. 2 at 18:02–18:03, *with* Dkt. 29, Ex. 1 at 11:53. *See also* Trans. 11:22:34–11:22:45 (unrebutted argument that Dimenteros searched Grigsby's bag prior to the other officer discovering that Grigsby was subject to an outstanding warrant). Second, as the Supreme Court has made clear, a "search [of] a vehicle incident to a recent occupant's arrest" is generally "only" permissible when "the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *See Gant*, 556 U.S. at 343. Certainly, "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Id.* (internal quotations omitted). But that noted exception to the general *Gant* rule does not apply here because it is unreasonable, not to mention temporally confounding, to believe that evidence related to a warrant associated with criminal conduct predating Grigsby's occupancy of the vehicle would be found inside his backpack.[11] Perhaps a search of the backpack

---

[11]    The Government did not submit the warrant into evidence, Sotuyo had not seen the warrant, and Sotuyo did not testify as to the basis of the parole violation precipitating the warrant's issuance.

26

would return additional evidence that Grigsby was out of compliance with his parole, but any such evidence would be separate from the outstanding warrant that served as the basis of his arrest on June 16th.

Therefore, with respect to Dimenteros' warrantless search of Grigsby's bag, the Government cannot avail itself of the inventory search exception, any exception under *Terry*, or the search-incident-to-arrest exception. The evidence will be suppressed unless an alternative exception is applicable. It is to that issue that the court finally turns.

### 4. The Inevitable Discovery Exception

During the suppression hearing, the Government argued that problematic prior searches notwithstanding, the inevitable discovery exception precludes suppression here because police eventually obtained a warrant to search Grigsby's backpack. *See* Trans. 11:45:05–11:45:21. The court disagrees.

The inevitable discovery exception requires the Government to prove by the preponderance of the evidence that (1) there is a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct and (2) the Government "was actively pursuing a substantial alternate line of investigation *at the time of* the constitutional violation." *United States v. Cherry*, 759 F.2d 1196, 1205–06 (5th Cir. 1985), *cert. denied*, 479 U.S. 1056, 107 S. Ct. 932 (1987) (emphasis added). *Accord Murray v. United States*, 487 U.S. 533, 541, 108 S. Ct. 2539 (1988) (noting that a "later, lawful seizure [that] is *genuinely* independent of an earlier, tainted one (which may well be difficult to establish where the seized goods are kept in the police's possession)" will foreclose suppression) (emphasis added). To the extent that the

---

*See* Trans. 10:35:46–10:35:56 (testifying that he had not seen a copy of the warrant). Nor did the Government argue that any exception to the general *Gant* rule applied. In any case, on this record, the Government has not shown by the preponderance of the evidence that the noted exception in *Gant* would apply, even if it had argued that it did.

"alternate line of investigation" has not yet formed, its existence must be "imminent" to qualify for the inevitable discovery exception. *See Cherry*, 759 F.2d at 1205 n. 10.

An outgrowth of two competing societal interests, the exception's two factors balance the principle that "the prosecution must not be in a better position as a result of police illegality" against its counterpart that "the prosecution not be put in a worse position by police misconduct." *United States v. Zavala*, 541 F.3d 562, 579 (5th Cir. 2008); *see also United States v. Lamas*, 930 F.2d 1099, 1102 (5th Cir. 1991). By narrowing the scope of situations where the inevitable discovery exception is available, *Cherry*'s second prong furthers the exclusionary rule's "core rationale" of deterring police misconduct. *See* 759 F.2d at 1203, 1205. As the Fifth Circuit explained:

> [W]hen the police have not been in active pursuit of an alternate line of investigation that is at a minimum supportable by leads, the general application of the inevitable discovery exception would greatly encourage the police to engage in illegal conduct because (1) the police would usually be less certain that the discovery of the evidence is "inevitable" in the absence of the illegal conduct and (2) the danger that the evidence illegally obtained may be inadmissible would be reduced. While suppression in such a case may put the prosecution in a worse position because of the police misconduct, a contrary result would cause the inevitable discovery exception to swallow the rule by allowing evidence otherwise tainted to be admitted merely because the police could have chosen to act different and obtain the evidence by legal means.

*Id.* at 1204–05.

The court concludes that the Government failed to satisfy either element by the preponderance. First, the Government failed to show by the preponderance that there is a reasonable probability that the contested evidence would have been discovered by lawful means because the basis of its lawful alternative—the warrant—was supported by an affidavit riddled with troubling statements, misstatements, and omissions in the affidavit. The Government did not contextualize or address these issues during the suppression hearing, and the court is doubtful that Dimenteros' unreasonable search did not influence Sotuyo's drafting of his warrant affidavit.

Though he omitted any reference to Dimenteros' improper inventory search, Sotuyo wrote that he "solemnly sw[ore] that [he] ha[d] reason to believe…that within a black 2015 Infiniti Q50…is evidence of the crime of aggravated robbery…more particularly described as firearms…stolen items, cash," and the like.  Dkt. 28 at 10.  In describing the facts upon which his belief was "based," Sotuyo noted that: (1) the vehicles principally associated with the armed robbery parked next to the Infiniti Q50; (2) "simultaneous[]" to the police stopping one of those vehicles, officers observed the Infiniti Q50 exit the apartment complex parking lot and change lanes without signaling; (3) Officer West, "a credible and reliable person," informed Officer Sotuyo that while he completed the inventory tow of the Infiniti, he observed a "Glock 26 pistol…with an extended magazine in plain view behind the driver's seat"; (4) that pistol resembled one of the guns used in the armed robbery; and (5) the Infiniti's driver had been charged with unlawfully carrying a weapon.  *Id.* at 10–12.  Sotuyo reiterated his belief "that within the black Infiniti Q50…law enforcement will find evidence material to this investigation…[n]amely, firearms…stolen items, [and] cash."  *Id.*  Of course, the basis of Sotuyo's belief was, in fact, much more extensive: HPD possessed concrete knowledge that Grigsby's bag contained firearms and cash following Dimenteros' unreasonable search.  *Accord* Trans. 10:30:05–10:30:17 ("Those pistols were…part of the list of stolen items from the…robbery on the 16th.").

Misstatements and omissions also stand out.  The body camera footage failed to establish that the firearm was in plain view.  *Supra* 17–18.  To the extent it could have been in plain view, it certainly was *not* in plain view *behind* the driver's seat.  *Compare* Dkt. 28 at 10–12, *with* Dkt. 29, Ex. 2 at 21:33–21:35 (showing Dimenteros grabbing the firearm from underneath the driver's seat).  To the extent that inventory photographers saw the firearm in "plain view" at all, they only saw it after Dimenteros (quickly) drove the Infiniti to a secondary location—facts that were omitted and that a magistrate could not easily deduce absent any reference to the felony stop.  *See*

Dkt. 28 at 10–12; Dkt. 29, Ex. 2 at 14:50–15:24, 15:49–16:22.  Relatedly, Sotuyo's affidavit failed to mention that two officers near the driver's seat—and, therefore, the firearm—did not comment on the gun's apparent, plain view position.  *See* Dkt. 29, Ex. 2 at 12:52–13:03, 13:17–13:20; Ex. 1 at 4:45–5:01.

Based on the record before it, the court cannot even say that the Infiniti driver's charge for unlawfully carrying a weapon was an "independent" development from Dimenteros' illegal search. *See Murray*, 487 U.S. at 541.  The Harris County District Attorney's Office filed charges against the driver on June 19, 2021, three days after the events of June 16th.  *See* Dkt. 29 at 2.  Sotuyo referred to the driver's pending charge and the fact that the Infiniti was his vehicle in his affidavit. Dkt. 28 at 10 (noting that driver, "who is the registered owner of the black 2015 Infiniti Q50 was charged with unlawfully carrying a handgun in motor vehicle.").  HPD received the warrant to search the vehicle on June 23, 2021.  Dkt. 28 at 9.  By July 9, 2021, the Harris County District Attorney's Office moved to dismiss the charges against the driver, citing a lack of proof.[12]  Dkt. 29 at 4.

Of course, probable cause determinations are made in view of the "totality-of-the-circumstances."  *Illinois v. Gates*, 462 U.S. 213, 231, 103 S. Ct. 2317 (1983).  But that is hard to do when police omit key details—an issue that courts have long confronted in challenges to warrants.  *See, e.g.*, *United States v. Davis*, 430 F.3d 345, 358 (6th Cir. 2005) (considering whether a warrant cured illegal search where affiant omitted a material fact of a drug-sniffing dog failing to alert to the presence of narcotics in the vehicle); *United States v. Reilly*, 76 F.3d 1271, 1280 (2d

---

[12]     Credibility concerns also animate the court's conclusion.  Putting aside the Government's own questionable framing of the facts in its initial filing, *see* Dkt. 20, Sotuyo's inconsistencies, contradictions, and misunderstanding of the law, the body camera footage, and the timing of the driver's charges leave the court concerned about affidavit's presentation of facts.  *See Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 154 (1978).

Cir. 1996) (considering omissions vis-à-vis the application of the good faith exception).  That warrant applications are typically submitted *ex parte* only underscores the importance of giving the judicial officer the totality of relevant facts.  Though a close call, the court cannot determine if, *ex ante*, the magistrate would have granted a warrant solely based on (1) the firearm resembling the one used during the armed robbery; (2) the other vehicles parking next to the Infiniti; and (3) the Infiniti leaving the apartment complex parking lot either while other vehicles were leaving or while other stops were occurring.  *See* Dkt. 28 at 10–12; Dkt. 1 (noting that the Infiniti exited the parking lot fifteen minutes after the Mercedes).  Insofar as this hypothetical determination is not obvious under the preponderance standard, the Government fails to satisfy *Cherry*'s first element. *See* 759 F.2d at 1205–06.

Second, on this record, the Government was not "actively pursuing a substantial alternate line of investigation *at the time of* the constitutional violation."  *See Cherry*, 759 at 1205–06.  The Fifth Circuit has considered multiple applications of the exception's second prong.  For instance, in *Lamas*, the court of appeals reversed the district court's application of the exclusionary rule where, at the time of the illegal search, police officers left the site of a protective sweep to obtain a search warrant.  930 F.2d at 1103.[13]  Similar facts guided the Fifth Circuit's reasoning in *United States v. Evans*, where it sustained the district court's determination that both *Cherry* requirements were met after "undisputed" evidence showed that law enforcement personnel "were already in the process of obtaining a warrant…to search" an apartment that other officers were illegally searching.  848 F.2d 1352, 1358 (5th Cir. 1988).

---

[13]     The *Lamas* court left open the question of whether *Cherry*'s second prong — the "active-pursuit element" — is "necessary to implicate the inevitable-discovery rule."  930 F.3d at 1104. The Fifth Circuit has never formally, or functionally, abandoned the *Cherry* test and restated it in full in *Zavala*, 541 F.3d at 579.  In any case, both elements remain binding precedent on this court.

31

But the facts here are meaningfully different.  Sotuyo did not submit his affidavit to the magistrate until a full week after Dimenteros searched Grigsby's bag.  *See* Dkt. 28 at 13 (noting date).  *See also Zavala*, 541 F.3d at 581 (noting that the inevitable discovery test should be applied at the time of the police misconduct); *Cherry*, 759 F.2d at 1205 n. 10 ("If the inevitable discovery exception can be applied only on the basis of the police officer's mere intention to use legal means subsequently, the focus of the inquiry would hardly be on historical facts.").  And while Sotuyo conceivably could have started drafting his affidavit well before submitting it, the Government did not present any evidence as to when law enforcement's efforts to obtain a warrant were set into motion.[14]  So, in addition to failing to satisfy *Cherry*'s first element, the Government has also not satisfied the second under the preponderance standard.[15]

This case, like those that have come before it invoking the inevitable discovery exception, is not one "in which the prosecution can escape responsibility for a constitutional violation through speculation; to the extent uncertainty was created by the constitutional violation the prosecution was required to resolve that uncertainty through proof."  *Williams*, 467 U.S. at 457 (Stevens, J., concurring).  Moreover, the court emphasizes that it does not believe that the Government was

---

[14]    Sotuyo's affidavit includes details of the Infiniti's driver's pending unlawful carrying of a firearm charge, which was not filed until June 19, 2021.  *See* Dkts. 28 at 10–12, 29 at 2.

[15]    The court makes two final observations.  First, the Government did not argue in its initial briefing that the inevitable discovery exception applied. *See* Dkt. 20.  Indeed, the Government's initial presentation of the facts and subsequent legal arguments did not correspond to the facts in the body camera footage.  *See, e.g.*, Dkt. 20 at 4.  Nor did the Government raise its inevitable discovery exception in a response to Grigsby's motion for reconsideration.  The Government has opted, instead, not to file a written response.  And, during the suppression hearing, the Government only devoted a few seconds worth of attention to the inevitable discovery issue in this case.  *See* Trans. 11:45:05–11:45:21.  Second, though the Government bears the burden of production and persuasion, its only legal theory in response to Dimenteros' improper search is that the inevitable discovery exception applies.  *See Alderman v. United States*, 394 U.S. 165, 89 S. Ct. 961 (1969) ("The United States concedes that when an illegal search has come to light, it has the ultimate burden of persuasion to show that its evidence is untainted."); *United States v. Webster*, 750 F.2d 307, 315 (5th Cir. 1984) ("[T]he Government has the ultimate burden of persuasion" where police conduct unreasonable search.).

*unable* to meet its burden to establish the exception's applicability—just that it did not. Accordingly, the defendant's motion for reconsideration is GRANTED, and the contested evidence is ORDERED suppressed.

### IV. CONCLUSION

For the foregoing reasons, Grigsby's motion for reconsideration (Dkt. 24) is GRANTED. The court's prior order denying Grigsby's motion to suppress (Dkt. 23) is WITHDRAWN.

Signed at Houston, Texas on April 18, 2022.

_____
Gray H. Miller
Senior United States District Judge